DEVELOPMENT BANK OF AMERICAN SAMOA, Plaintiff

v.

TALO LAVA and TUVALU LAVA, Defendants

High Court of American Samoa
Trial Division

CA No. 55-87

July 20, 1987

Before KRUSE, Associate Justice, TAUANU'U, Chief
Associate Judge, VAIVAO, Associate Judge.

Counsel: For Plaintiff, Robert Dennison
Talo and Tuvalu Lava pro se

This matter came on for hearing upon
plaintiff's motion for default judgment. Defendant
Talo Lava, having been noticed with hearing of the
motion, appeared pro se.

The complaint seeks judgment on a promissory
note made by defendant in favor of plaintiff
evidencing a loan made. With interest, costs, and
attorney fees, the plaintiff bank seeks judgment in
the sum of some $15,298.29 plus post-judgment

-24-

interest. The note in question is for the face amount of $10,000.

Defendant contests the amount of his indebtedness to the bank,[1] claiming that he never received the total $10,000 purported to be 'loaned to him, and that the bank official who dealt with him at the time, Tamafili Suisala, allegedly in concert with a certain contractor, helped themselves to the loan proceeds without his knowledge or consent.

This story is becoming distressingly recurrent, and the bank official accused has since been removed from his position as vice president of the bank and is currently serving a jail term on a miscellany of theft-related convictions.

## FACTS

### Promissory Note I

Defendant's version is that he applied to the bank for a loan of $10,000 to wall in his open structure, built by the government's disaster relief agency consequent to a landslide occurring in his village. His loan request was approved initially only up to an amount of $6,000, by Suisala. A copy of a promissory note to this effect was not found in bank files, but evidence of this loan transaction is found in a chattel mortgage document dated April 13, 1981, executed by defendant to secure repayment of $6,000. Defendant says that he was disbursed some $4,000 of the loan proceeds for the purchase of materials for the project. He also contacted a builder trading under the name of "Kilipoa Construction" to close in the existing structure with cement blocks. He accepted this builder after he was given an estimate for labor of $300.

The Loan Disbursement Schedule of the bank reveals that between April 13, 1981, and May 26, 1981, the sum of $2,681.04 was disbursed for materials, and the bank's records contain corresponding receipts from various merchants to this effect.

---

1    Notwithstanding default, defendant may appear to contest the extent of the indebtedness. TCRCP Rule 55(b). See also Peitzman v. City of Illmo, 141 F.2d 956 (8th Cir. 1944), cert. denied 323 U.S. 718.

On the other hand, between June 16, 1981, and July 2, 1981, the sum of $3,296.46 was disbursed by the bank to Kilipoa Construction without any explaining documentation or signed approvals by the borrower. Also, an additional sum of $22.50 was disbursed to the bank on July 2, 1981, which item brought the disbursements to $6,000.

One curious document we find in the bank's file is a contract form under Kilipoa Construction letterhead, dated June 25, 1981. The document contains the notation in Samoan to the effect that: "Talo is agreeable that the agreement pertaining to his house in Se'etaga has ceased in effect." This document also contains a notation, "Pd. Ck #10598, 6/24/81." (Cross referencing the Loan Disbursement Schedule, a payment of $1,150 was made to Kilipoa Construction on this date.) The document purports to be signed by Talo Lava; when it was produced to the defendant, however, he denied signing the said document. He states that his agreement with Kilipoa was fixed at $300.

We accept defendant's testimony on the forgery of his signature. The construction ceased after the use of the purchased material aforementioned, leaving about twelve feet of walling left to be completed. Thereupon defendant went with his contractor to draw on the balance of the loan proceeds, which defendant believed to be about $1,900. Of course there was no money there, and the contractor must have known this as he was disbursed funds without defendant's say-so. When defendant confronted the bank official Tamafili Suisala on where the loan monies went, the official countered by approving an additional $4,000 loan, which the defendant was told would finish off the enclosing plus add an extension to his house.

## Promissory Note II

After dismissing defendant's complaints on the balance of the loan proceeds with the tender of an extra $4,000 credit line, Mr. Suisala had a new promissory note drawn up for the face amount of $10,000, together with a corresponding chattel mortgage, both dated July 7, 1981. These he got the defendant to sign. Additionally, in his manner of efficiency with the records, we note of the Disbursement Schedule that the $6,000 loan reference is penned out and the figure $10,000 written over holographically.

We further find on file with the bank a Construction Contract dated July 6, 1981, under Kilipoa Construction letterhead. It is signed at the signatory block for a "Company Representative" while unsigned at the block designated for "Purchaser." It purports to bear defendant's signature midway down the page, but defendant claims that he did not sign this document. The document further has a designation "Price," which is filled in with the figure "3200," and a designated heading "10% Deposit" filled in with the amount "$2500."

Again we accept defendant's version of this document, that it was not signed by him. The document has a carbon copy on file, and the proposed signature of defendant on the original does not appear on the carbon. It looks to the Court that the purported signature of defendant was later added on the original, after it was separated from the carbon. Further, the document is hardly at arm's length in purport. Just how the deposit sum of $2,500 equates to ten percent of $3,200 belies the ordinary in commercial transactions.

We go to the disbursement schedule again and find that on July 8th, 13th and 24th, 1981, the total sum of $3,900 --- of the $4,000 credit line- -- was disbursed to Kilipoa Construction. Again the disbursement receipts reflect unilateral action by the bank without any involvement on the part of borrower.

Defendant said that hereafter the contractor dealt directly with Mr. Suisala. Work recommenced on the house, but instead of completing the wall work with cement blocks as started, the contractor finished it off in wood. The extension itself to the house was at the contractor's control. Defendant complained that the same involved a dropped floor level and was only partially extended along the breadth of the building. Defendant states that one day, without warning, the contractors failed to return, and while the resulting extension was substantially completed, the roof has leaked from the outset.

Defendant stopped paying the bank on the ground that Mr. Suisala and Kilipoa Construction were in collusion, and so advised Mr. Suisala when the latter confronted defendant on non-payment. Defendant invited Suisala to sue him. As things have turned out, Mr. Suisala is no longer able to

be involved, and the current bank officials have inherited the litigation.

One further document among the exhibits received warrants mention. This is an "Agreement" dated March 26, 1987, prepared by the Bank and signed by defendant, whereby defendant acknowledged the indebtedness on the "promissory note(s)" and in consideration of the bank's forbearance to sue, defendant agreed to repay the notes according to the payment schedule therein provided. This document also contains provisions to the effect that defendant waived all defenses. Bank employee Siao Elisara, who sat down with the defendant when this document was signed, was not able to explain to defendant what the provisions of this agreement meant, save to inform defendant that the agreement correctly reflected his indebtedness to the bank.

On the foregoing, we consider the extent of the indebtedness, if any.

### Indebtedness

Our analysis of the facts leads us to the conclusion that the promissory notes executed by defendant --- for $6,000 and then for $10,000--- do not evidence indebtedness. The notes at best reflect a window-dressing exercise with the records of the bank, to disguise the underlying dealings that in fact occurred. Firstly, defendant was availed of a credit facility up to the amount of $6,000, and defendant acknowledged that he drew down on the proceeds to purchase building materials. While defendant was of the understanding that he had drawn $4,000 of the loan amount, the bank's records in fact show $2,681.04. The balance of the line of credit (less $22.50 paid to the bank) was disbursed by the bank, without defendant's knowledge or consent, to pay the builder, with whom defendant had contracted on the basis that labor costs would be $300.

We find that this was a breach of the loan contract by the bank. Our conclusion that there was a unilateral breach of the loan contract is affirmed by defendant's expectations that there was still available credit when he visited the bank to further draw for the purchase of additional building materials. As it happened, defendant's queries on the balance of the loan were countered by Suisala's arranging of an additional $4,000 line of credit.

-28-

At this point, the $6,000 note was presumably withdrawn and destroyed and a new note drawn up in the face amount of $10,000. As far as records go then, for audit purposes, the bank's funds were accountable on paper.

As stated in the facts, the second $4,000 credit line was again unilaterally disbursed by the bank through its officials without the knowledge and consent of the borrower. This was clearly evident on the disbursement receipts, which were conspicuously blank in terms of borrower's acknowledgment.

Again we conclude a breach of contract by the bank through the actions of its officials. Borrower testified that he had no idea how the said $4,000 was handled and that Suisala dealt only with the builder thereafter. This testimony was corroborated by bank employee Siao Elisara. Further, the builder received $3,900 of this money notwithstanding that the asserted building contract on file, dated July 6, 1981 (and purported to be signed by defendant), stipulated a contract price of $3,200.

CONCLUSION

We conclude a breach of contract by the bank through the actions of its employees, although we could have equally found on the facts a conclusion within the realm of fraud.

This notwithstanding, our conclusions are not to say that defendant did not benefit in the matter. Although not to his entire satisfaction, his house was improved with bank funds. On the basis of the evidence, we find the defendant indebted to the bank in the following amounts: $2,681.04, being the cost of materials purchased with the proceeds of the first note; plus $300, being the defendant's understanding of labor costs; plus $3,200, being the builder's assessment of the value of labor and materials expended in completing the enclosure of defendant's house together with the added extension. This last figure we find as the reasonable value of those labor and material costs.

Plaintiff's claims for attorney fees and costs are disallowed. The cause of action provided in the terms of the promissory notes for attorney fees and costs are inappropriate for the same reasons

-29-

for which we find the said notes to be inappropriate evidence of the indebtedness.

### ORDER

It is accordingly Ordered, Adjudged and Decreed that plaintiff have judgment against the defendant Talo Lava in the sum of $6,181.04 plus interest accruing to date hereof at the rate of 8% per annum, to be computed as follows: interest on $2,981.04 to accrue from April 13, 1981; interest on $3,200 to accrue from July 7, 1981.

It is further Ordered that all payments made by defendant to plaintiff to date shall be first applied to interest as above stated, and the balance, if any, to principal.

It is further Ordered that plaintiff shall have post-judgment interest at the rate of 8% per annum.